Good morning, Amanda Masters for the appellant, Mr. Dennis Henneman, and I would like to reserve three minutes for rebuttal. At first glance, there are many issues in this appeal, but there is really only one true central issue that this court needs to decide, and that is whether a reasonable jury could determine that Kitsap County failed to accommodate Mr. Henneman when it knowingly provided him with an ineffective accommodation outside of his doctor's restrictions, which ultimately led to the end of an over 24-year career with this employer. Let's just be specific about what you're talking about there. Of course. Kitsap County argues that it granted all of Mr. Henneman's accommodations. Right. That's why I'm confused. I thought that they did, and so what's... Well, liability, as the Court of Appeals found in Frosino, Washington Court of Appeals, that liability returns on whether the accommodation granted was effective. Here, they granted an ineffective accommodation. Mr. Henneman's doctor said what he can't do. It was up to Kitsap County to determine what he could do. Mr. Henneman didn't ask for a control room position. He just asked for a position within his accommodations, which were he could not be around volatile and dangerous situations. Could not be around what? Volatile and dangerous situations, and he could not be around inmates. Here, if you look at the excerpt with the record number 241, you have an email from a lieutenant saying, can this person respond to emergencies as a control officer? If he can't respond to an emergency in the control room, then he cannot effectively perform this position. First of all, is this argument in your briefs? I don't think so. We did argue that the accommodations provided weren't effective. We're just expanding upon it. Not at this level of detail at all. We're expanding upon it now. Okay. Because I didn't think that was the focus of the case at all. The focus of the case is failure to accommodate. And not the whole issue of the reinstatement and the retirement and so on. It's back before that. That is what Kitsap County is arguing. We are not arguing that. We are arguing that Kitsap County failed to accommodate Mr. Henneman, which led to the end of his employment. But a failure to accommodate, in your view, is the job they did give him was not one that suited his restrictions? Correct. It had to be effective. And what connection between the two, then, can you show in terms of, does he ever say or do they ever say that the new job has that problem but some other new job wouldn't have that problem? Well, they have to engage in a trial and error to figure that out. And as soon as Mr. Henneman is saying, I can no longer do this job, I'm struggling, that was him conveying that. He said, I want to retire. But that was his way of, that was a person with a mental health disability conveying that the accommodation in place was not effective. And the Court of Appeals found in Frosino that it is on the employee to convey whether accommodation is ineffective or not. However, it doesn't say that that has to be in a neat letter saying, this is ineffective. It just has to convey, put the employer on notice. And you're saying that what put him on notice was his saying, I want to resign? Correct. He's sitting there crying and saying, I'm not a tough guy anymore. I can't do this. And then you have a series of events where he's crying at work all the time. He is asking his co-workers for peer support. He is showing up to work asking for medical attention. He's having a hard time. He's struggling. Kitsap County And all of this is in early 2015? Correct. Is it a period that you're now relying on, the period between when he issued his retirement letter and when he actually left, about two weeks? Is that what you're talking about? Correct. At the end of January? Yes. And that's when they should have known that this particular job wasn't working? Correct. And found a different job, put him on leave? They should have engaged He said he wanted to be on leave. He said he was cleared for work by his, I mean, I from your argument, that was not my understanding of the case, which makes me struggle with how to think about it. But if that's what you're presenting to us, then we're supposed to figure out whether the employer, from the point, because he issued the retirement letter, should have realized that this particular job wasn't working, as opposed to any job. Whether that particular accommodation, at the point he retired, he was still in that late duty position. So what he told them was, essentially, I don't want to work in corrections, I want to go do something else. While he was struggling with a mental health disability, because he was forced back to work when he wasn't ready to come back to work. And that might be a pretty good argument on a discrimination claim, but you're telling us that that's not where we should be focusing. Because it's a failure to accommodate, which gives rise to the discrimination claim, because it's the adverse action that leads to the discrimination claim. I'm still lost, and that's why I jumped in so early. Because I thought that he took the leave, he got the doctor's limitations, presented them, and they said, yes, okay, we'll put you in a different job than the one you had that complies with those limitations. And I thought that the employer had done that. That's why I'm so confused about, you're now saying that there was something more they needed to do? Well, Kitsap County admitted in its brief that it was outside of his doctor's restrictions. What was specifically? The control room? Yes. He had to be able to respond to emergencies in the control room, which he would be unable to do because of his doctor's restrictions. And the light duty... Where's that in the record? That he had to be able to respond to emergencies? Frankly, I had no idea. It's on page 30 of Kitsap County's brief, as well as excerpt of the record 241. So I'm looking at 241, it's that email that you mentioned. But what is this telling me that's so critical to your case? I asked Officer Heinemann if the doctor had any concerns with him responding to emergencies as a control officer. And he said it can't be around inmates. How could he respond to an emergency with an inmate if he can't be around inmates? But so then you're saying that there was some other position that he should have been transferred to that the employer refused to transfer him to? No, at that point it was for... It's under Freseno. You have to engage... The employer has to engage in a trial and error to come up... To determine whether or not it can accommodate an individual. Kitsap County never did that. They just said, here's our light duty position. Even though it's outside your restrictions, go try it. What other position was available to him that he should have been given instead of that one? And that's something for Kitsap County to have determined. No, I'm asking you. What were the options that they had available? They didn't give him any options. They said this is the only option. Your brief is arguing that had they earnestly began the interaction process as required by law on December 23rd, that's a different time period, and would have discovered that with an additional short medical leave, he could have been able to return. But at the point he came back, he had a letter from his, if you look at the medical records, the psychologist affirmatively wanted him to be back at work. It was better for him. She released him back to work because Kitsap County told him that if he didn't come back to work, he would be terminated. And that phone call- Or he would have to get an additional FMLA leave, which he did. Correct. So- But that FMLA leave was only for an additional three days, which wasn't enough time. Okay. And then they say, well, if they had asked us for more accommodation and more leave, maybe it would have been good, but somebody never asked us. But also, the psychologist in the medical records, as I recall, when he said, I'd really like more time off, she said, no, it's better for you to go back to work, in the medical records. But she didn't release him to his job of injury. I'm sorry. But is there anything in her release or restrictions that interacts with this control room that says, you know, that affirmatively says you can't be around inmates, even in a control room? Okay. Or is the argument on page 30, which you do make, says if he couldn't ever be around inmates, then he couldn't be in the control room because he might sometime have to be around inmates? Correct. But is that connection made anywhere that somebody says, oh, yes, a control room would be okay, but remember, you've got to be around inmates in an emergency? Did he say I can't be around emergencies? Did they say, remember, you've got to be in emergencies? Did the psychologist say you can't be around inmates in an emergency? The psychologist said he can't be around volatile and dangerous situations, which one would expect would be what's happening in an emergency and a correctional. But is there anything in the record to suggest that what he was so upset about in January had anything to do with this, that he'd ever been asked to be around an inmate in an emergency? It doesn't matter because he was struggling. And that if he hadn't... Yes, but he wasn't struggling with this problem because it wasn't happening. He was struggling. He was... He went back to work. I know. But what did it have to do with the accommodation? I mean, if the issue had ever come up that he had to actually be around inmates in an emergency, that would have been an explanation for why he was struggling, but there's no indication in the record that it ever came up. Because he shouldn't have been able to return. He should have been given the leave he asked for, which when he asked to use his 240 hours of... A different point than the one you just started up with. But it's not because it shows the accommodation was ineffective because he went back to work and he was still struggling. He shouldn't have been there. But it was not only clear to go back to work, but a psychologist thought it was better for him to go back to work. And I disagree that the psychologist said it was better for him to go back to work. I would have to go back and look at that. I don't know that that's what his psychologist said. Is it correct that there's nothing in the record that indicates that there ever was any emergency that he was asked to respond to? No. And what you say he was struggling is that he drafted an undated resignation letter. He was overheard saying that he was contemplating resigning. Is there anything else that you would characterize as, quote, struggling? This is a person with a mental health disability. It's not like a broken bone. He can't come out and say, my arm still hurts, I can't do this job. This was his way of dealing with being back in a position that he should never have been back in so quickly. Are you saying that's what you call stress? Was your term about stress relief, that this was a way of dealing with it? It was Mr. Henneman's term. So are you, I must admit that I thought the core of this case was around the issues of the retirement and the failure to reinstate. Are you walking away from those issues now? No, not at all, Your Honor. He was, even if you look at whether he... Here's what I thought the case was about, okay? This person has a mental health disability and he basically, for reasons connected to that disability, gives this retirement letter because he doesn't have good judgment in someone at that point. And then two days later, he comes back and says, I don't really want to do that. And they say, not taking into account at all his disability, they say, well, you can't do that. And then they don't hire him, don't reinstate him, which is essentially a hiring. The district judge says, well, that's not an adverse employment action, which I don't understand because not hiring somebody is certainly an adverse employment action. So at least looked at from a hiring point of view, it was an adverse employment action. And then we're supposed to figure out whether he was discriminated against, which wraps in some accommodation because it has to be that he could do the job with or without an accommodation. But you're now telling me that we're supposed to start way back before that to worry about what's going on in this case. Absolutely. And that is what we presented in our brief, that had they engaged in the iron or active prior to him coming back to work, then we wouldn't be here today. When he made that phone call or when Kitsap County made that phone call and said, you have to come back to work. And he said, I'm not ready. Can I use my leave? And they said, no. And that's a dispute, a disputed fact. They're saying that didn't happen. He's saying it did. He is. This is from SAP. Is that the name of the person? Yes, I believe so. But then, in fact, he, you know, he did not work and nothing else happened to him until he came back to work on January 2, right? Well, the phone call was on December 23rd, I believe. So it was a very short period of time that we're looking at here. Nevertheless, he got, he got in that sense, he was not fired for not showing up. He did get the FMLA leave plus two or three days of annual leave. Is that right? That's the way I understood it. I don't believe he got any annual leave, but he got to the end of FMLA leave, but he still had to return to a job. He wasn't ready to return to yet. And had they just engaged properly in the interactive process, again, we wouldn't be here today. But by an interactive process, you would normally think, here's your job. He says, no, I can't do that job. What's another job? So you said, they say, here's your job. And as far as they know, he shows up. But again, liability turns on whether that was effective or not. And when do you measure whether it's effective? When he's sitting in the chief's office, the chief who has a long-standing knowledge of this person's mental health disability, and he's crying and saying, I'm not a tough guy anymore. That should have signaled to the chief that something's going on here. That is around, that is the 13th? Correct. So it was effective up until the 13th? Well, it was never effective, I would argue, but that's when he... And he resigned that same afternoon? Well, that's when he conveyed that the accommodation was no longer effective. By resigning? Yes. So by resigning, he conveyed that the accommodation was not effective. All right. When your time is up, we'll give you a minute of rebuttal. Thank you. Thank you. Jacqueline Ofterhide, representing Kitsap County in this case. To answer some of the questions that have been raised, the most important issue, according to the plaintiff, is that the accommodations were ineffective. And she points to the fact that he was assigned to the control room and that ostensibly was not effective. But it was the control room that his physician specifically assigned him to. His physician was given two functional analysis for jobs. The full-duty job appears at page 85 of the record, ER 85. So that was his full-duty job. Dr. Friant said he was not fit to perform the full duties. She examined the light-duty job, specifically says on the front page, control room. And on page 106, that starts at ER 100, and at page 106, she authorizes him to perform that duty in the control room through our effective January 2nd, when he was released to duty in the control room, until about February 2nd, to be determined later. So he was released to what the sheriff's office had created as a light-duty job for officers on L&I, on FM&LI, or, you know, all of these other reasons. So, and at no time did Mr. Henneman express to the employer that that assignment to the light-duty control room was ineffective. What about the email that your opponent referred to, where it does seem pretty clear that the aspect of the control room duty that would require you to respond in these emergency situations was inconsistent with the limitations imposed? So the county raised in its brief concerning the medical inquiries, because the plaintiff challenged the medical inquiries that were made or asked for on October 6th, when everything came up. And so the argument was made by the county that the medical inquiries were necessary for many reasons. And that includes the control room. There are times that an employee might need to respond to emergencies in the control room. Mr. Henneman was never asked to respond to emergencies in the control room. Now, Lieutenant Payne did talk about concerns about him responding. She was concerned about liability. But that's always going to be a question. When you've taken a regular officer off the floor, putting them in the control room, and if you look on, there were eight employees on duty in the control room, light duty, during that period of time. So you're taking a regular employee off the floor, you're placing them in the control room, you're increasing the burden on regular staff. So it was a discussion they were going to have. How many people do we have in the control room? How many people do we have on light duty? But ultimately, he was given that position, and he stayed in that position until he resigned. So we think the accommodations were effective. He never communicated that they were ineffective. And the accommodations were reasonable because they followed what his doctor had prescribed. There's an argument that he wanted more time off. But if you look at Dr. Friant's, the notes to Dr. Friant's record, when he asked to extend, he said, if I don't extend my FMLA leave, then I could lose my job. And she considered whether to extend his FMLA leave, but she did not. Instead, she said, get back to work. And I'll agree with her. Page is not on, by the way. That would have been on page 98, excuse me, ER 98 and 99, ER 106. Yeah, SER 99 is another page because there's duplicates of all of this. But Dr. Friant, I mean, he said, if the employer does not extend my FMLA leave, he will be on leave without pay. And Henneman agreed to the plan. She wrote in her notes, SER 99, to extend his leave to January 2nd and return him to light duty work. So she denied his request to stay on leave indefinitely and instead said to get back to work. So we gave him what he asked for. Did that one specifically say the control room job? At one point, it sort of sounded like you said that, but I wasn't sure. Well, at that point in time, there's a note where he calls her on the phone complaining because he's afraid he's going to go on a leave without pay status and he wants additional leave. And it's in that note where she says, you should get back to work. I know, but the difference between get back to work and get back to work in the control room job. And that's the December 29th functional analysis pages that I just described, 100 to 106. So that's a doctor's functional analysis, which says he can do that job. Right. It's a functional analysis that the county submitted to the doctor, two of them, one for his full duty and one for his light duty. She denied the full duty, but she agreed that he could perform the control room light duty job. So at that point, at least the county has reason to believe, has the doctor's note that he can do this job. Now, at what point should the county have known that he couldn't do the job or that it was an ineffective accommodation? We don't think there was any evidence that he couldn't do the job. Was the accommodation reasonable? Yes, his doctor said it was. And once it's been determined that it's reasonable, then according to Griffin versus Boise Cascade, citing Sharp versus AT&T, the Ninth Circuit cases we cited, that once the accommodation is reasonable, then that's it. The inquiry is over. Well, it's not over if it then becomes apparent or there becomes evidence that he can't do the job. I mean, if, for example, there had been an emergency and he cowers in the corner and other people couldn't cover for him, that would be evidence. But so I'm sort of asking, when he goes to the superior that morning, if he hadn't resigned, would that have been something the county should have understood? The only issues that arose during the time that he returned to work was that he wasn't happy with a shift change. He was placed on swing rather than grave, which he bid for. But he said to Penelope Sapp, Lieutenant Sapp, that he wanted to delay the shift change for family reasons. The other issue he brought up was vacation, that he didn't get the vacation slot he wanted. But the person- I understand that, but- But there's no other evidence that he raised. What about the meeting that morning where he's crying and he says, I can't be a tough guy anymore? Well, but he was upset. After 24 years of retirement, he was upset, but does crying necessarily mean- Well, was that before he retired? See, I'm distinguishing. It's very close in time, and maybe that makes it irrelevant. But I thought he has this meeting with all that stuff, and then he submits the resignation like he decides between the two. No, the crying event. He drafts a resignation letter, sends it to his home about, I think it was July 9th, or excuse me, January 9th. But it doesn't go outside his home. Right. Then he comes in and presents it. He schedules a meeting beforehand with the sheriff. I see. And then he meets with Chief Newland and Jeannie Elton. And on that day, he says, I'm quitting. He already has the resignation letter. He has it in hand, and within an hour or two, he delivers it to the sheriff. At that meeting, toward the end of the meeting, he does get emotional and start crying. But does that signal to the employer, our accommodations are ineffective? And we submit that no, they don't. But particularly when you look at the evidence and all this forethought that he went into resigning. But it might signal to his employer that there is a connection between the disability and this resignation or retirement. And that when they refuse to take him back because they say he has bad judgment and he's not honest, that is essentially a stand-in for, or directly linked to his mental health situation. Well. So is your position on that, I know she's not arguing this now, I don't know why. But is your position on that, that, as I understood it, your position or the District Court's position is that's not an adverse employment action. That can't be right. Well, I think it depends on the facts, Your Honor. If someone is effectively forced to resign, that's the cold constructive discharge cases, which would force someone to resign, clearly- Somebody applies for reinstatement, they're applying to be hired, essentially. And if you don't hire somebody because of a disability, that's an adverse employment action. So if discrimination isn't a factor, if disability isn't a factor, and if I resign- No, of course it is a factor, but I posit it is a factor. My posit is it is a factor. It's, under these facts, it wasn't a factor, because it wasn't his disability that caused him to resign. It wasn't the ineffective accommodations that caused him to resign. He was tired of the job, he was disgruntled- I know, but the question is why, when, should the employer have realized that it was his disability that was at least influencing their reaction to whether to let him come back? It wasn't until he submitted his letter on January 27th, asking for reinstatement as an accommodation, that the employer needed to consider it. Okay, but I thought your position was you didn't need to consider it, because this wasn't, it was simply outside the realm of the employment discrimination. Did he need to consider it at that, did the employer need to consider it at that point? We don't think they did at that point. Why? Because it was, he had already resigned, there was no evidence that the resignation was tainted by his disability, the accommodations were effective, and there was no- But suppose somebody had walked off the street and applied for the job, and they had reason to understand that he had a mental health disability, and the reason they gave for not hiring him was directly linked to his mental health disability. But those aren't the facts that we have here. Why? Because a person who decides to resign, why would an employer have to take somebody back who resigned? Well, they might not have to, but they might have to at least consider whether to take him back. And you're saying they didn't have to consider it. If there were, I would say an employer would have to do so if there were facts showing that the resignation was effectively constructive discharge, or it arose out of the disability. This is what I don't understand. I don't understand why they didn't, I mean if, suppose they had, at the time of his reinstatement, suppose his job was still open. I don't know if it was or wasn't, I don't know if the record shows it. But suppose his job was still open, and he'd be the best qualified person for that job because he just had it. And they're saying, well, we don't want you because, as I understand it, you're inconsistent and you're dishonest, something like that. Because he didn't want the job anymore. He wanted to be a truck driver. But now he's saying he did. Well, but why does an employer have to take somebody back just because they want to take them back? Unless the law imposes some duty, why would an employer have to second guess? To consider that question without a discrimination based on his disability. Including whether there's any viable accommodation. Did they do any of that? I'm sorry? Did they do any of that or did they just say, no, we don't want you? They essentially said, no, we don't want you. Well, to me, if there's a problem in the case, that's the problem in the case. But his lawyer is now telling us that's not what the case is about. Well, if it's a wrong headed decision, if it was not prudent, that's not what the law is. The law is, was it motivated by a discriminatory- If somebody walked in off the street and applied for his job, now they're advertising the same job. Somebody walks in and applies for the job and has the same mental health disability he has. Does the employer have an obligation to at least not turn him down from the job because of his disability without considering whether he can be accommodated? Suppose somebody walks in who can't walk, right? There's a whole hiring process for law enforcement in particular. At the time someone applies, can they perform the essential functions of the job with or without accommodation? And that's the analysis that would be going on. But you're telling me that they didn't have to do that analysis. They could just say no. They didn't. They didn't. An employer, if absent any of those kinds of facts, doesn't have to take back someone's resignation or reinstate them if they've changed their mind. And at this point, all the evidence shows he had a change of heart, a change of mind. And in fact, two employees, I think it was Officer Peterson and Watkins, had to convince him to retract his resignation. He didn't want to be a law enforcement officer anymore. And he convinced his supervisors that that was the case. And so in the regular world, why should someone take somebody back that doesn't want to be there unless you can show that the resignation was motivated by discriminatory animus, or if it resulted from the disability itself? Can I ask just a factual question? I thought when he requested reinstatement that he did try to explain that the earlier resignation was in fact connected to his disability. It's a disputed fact, Your Honor, as to what was said during the meeting on January 22nd. The Sheriff's Office says that nothing was mentioned during that meeting about him wanting to come back because of, that he resigned because of his mental disability. The Sheriff's says that that didn't come up in that January 22nd, so that is a disputed fact. Okay, but so just under the formulation that you just posed, doesn't that mean this has to go past summary judgment? Because one of the exceptions, you said, was if the resignation had been connected to the disability. It seems like there is in fact- But is it connected to the, we think there's no question of the fact that it wasn't connected to the disability. You said there's a dispute. Well, whether he asked for reinstatement on January 22nd, and when he asked for reinstatement, he said, I resigned because of my disability. Right, but I was agreeing with you up to the point where the employer, you get the resignation, it seems on its face, it seems legit. You didn't do something to sort of force the person out, I get that. But when you are put on notice as the employer, that the person says, wait a minute, I didn't mean to really resign. I was going through this thing that's connected to my disability. Don't you have an obligation at that point to do some different analysis, as Judge Berzon was suggesting? Not if you don't believe that it was the disability that caused his resignation. And the facts of this particular case show that was not, that it was, he very thoughtfully planned out his resignation. There's nothing in the record indicating that reinstatement was medically necessary. He didn't even provide evidence that reinstatement was medically necessary. Reinstatement obviously isn't medically necessary. Working and making money may be personally necessary. That's not the question. The question is- The question is whether we had to accommodate him by taking him back. Well, an accommodation requires medical necessity. And here it was not medically necessary to reinstate it. The Wheeler case, the- Those three, those cases that talk about reassignment, transfer, restructuring the job. But let's go back to my person off the street, okay? A person off the street comes in and applies for a job and he's in a wheelchair, right? The employer, can the employer say, I just don't want anybody in a wheelchair? No, under the statute, they can't. What they can do is say, I, there's an open job, you have some qualifications for it, but you would have to be accommodated and what kind of, then you get into discussion. You know, what could you do that would, what kind of accommodations would work and so on. So why isn't he at least in the same position as that person? Because he quit voluntarily. Okay, fine. But now he's coming back. Well, does an employer have to take back an employee who quit voluntarily, absent these other factors? And he's saying, and I really didn't quit voluntarily, it was part of my disability. Anyway, I think we've- If you, if he was treated as someone off the street, you wouldn't have an obligation to generically accommodate him. You would have to look at the job and say, can you in the wheelchair do the job just as well as somebody else if we provide you with this or that? Exactly. Is that a little different? Yes. Yes, but- So that a person, you know, he can't lift things as much, but if you give him a tool, then he can. But it doesn't mean you have to hire him as a secretary. Right. Okay, thank you for the argument. Interesting case. Yes, ma'am. We'll give you a minute or two. On the issue of the job analysis that Dr. Friant signed off on, on excerpt of the record, I believe it was 101. That job analysis does not state that Mr. Henneman might have to respond to emergency situations. It was an incomplete job analysis. But he didn't have to respond to emergency situations. So it couldn't be the reason why he was floundering. That's not necessarily true. There could be other things that weren't included in that job analysis that she might not have signed off on. What I'm saying is she was not given the complete picture of what that job entailed by Kitsap County when they provided her with that job description. And just to touch on that it was not, or that it was thoughtfully planned out retirement, it wasn't. That shows a grave misunderstanding of how subjective mental health illnesses work. What's on the record on that question? So we do in the record have the forensic psychologist report from Dr. Jeffrey Hart, which stated the fact he was so angry about something that seems so inconsequential to a lay person without a mental health disability, the vacation leave. What shows that he was in the throes of his mental health disability, and it was a symptom that he tendered his resignation because of that disability. Okay, thank you very much for your arguments. The case of Hindeman versus Kitsap County is submitted and we are in recess.
judges: Boggs, Berzon, Watford